UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL GLEED,

          Plaintiff,                           Case No.  13-12479

v.                                        Paul D. Borman
                                        United States District Court

AT&T SERVICES, INC.,

          Defendant.

_____/

OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (Dkt. No. 20)

This action arises from Plaintiff Daniel Gleed's allegations of disability and gender discrimination against his previous employer, Defendant AT&T Mobility Services, LLC ("Defendant").  Plaintiff filed his complaint in this Court on June 6, 2013.  (Dkt. No. 1). Plaintiff's complaint sets forth three counts: (1) a claim of disability discrimination for failure to provide a reasonable accommodation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12102(2); (2) a claim of reverse gender discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C. § 2000e-2 and (3) a claim of "constructive discharge".

Now before the Court is Defendant's motion for summary judgment which was filed on March 28, 2014.  (Dkt. No. 20).  Plaintiff responded on April 17, 2014.  (Dkt. No. 23). Thereafter, Defendant filed a timely reply.  (Dkt. No. 25).  A hearing on this matter was held on May 22, 2014.

# I. BACKGROUND

1.    Plaintiff's Employment

Plaintiff began working for Centennial Wireless in June, 2009 as a sales consultant in Jackson, Michigan.  (Def.'s Br., Ex. 43, Gleed Dep. at 26).[1]  In January 2010, Centennial Wireless was acquired by Defendant, and Plaintiff became employed by Defendant as a Retail Sales Consultant ("RSC") at Defendant's Jackson location.  (*Id.*).

While Plaintiff was employed by Centennial Wireless the store was set up such that Plaintiff had a desk at which he was allowed to sit while not engaged with customers.  (Gleed Dep. at 31).  After Centennial Wireless was acquired by Defendant, the business was moved to a new facility which did not have desks on the sales floor but rather contained counter-height terminals where employees could enter orders for customers.  (*Id.* at 33-34).  Employees would greet customers at the door and then walk them through the store and various terminals to show them different products.  (*Id.* at 34).  Plaintiff admitted that the RSC position demanded standing for long periods of time.  (*Id.* at 35-36; Ex. 1, RSC Job Description).

While employed with Defendant, Plaintiff usually worked an eight hour shift which included a thirty-minute unpaid lunch and two fifteen-minute paid breaks.  (Gleed Dep. at 43).  Plaintiff testified that sometimes he received his paid fifteen-minute breaks but sometimes not, however, he stated that he ususally received his thirty-minute lunch break.  (*Id.*).

For the pertinent time periods, Erick Smith ("Smith") was the store manager at Defendant's Jackson store and was Plaintiff's supervisor.  (Gleed Dep. at 50).  Smith reported to Brandon Mazer, who was the district manager.  (*Id.* at 50-51).

---

[1] Unless otherwise noted, the exhibits cited are attached to Defendant's Motion for Summary Judgment.

2

2.      Plaintiff's Alleged Disabilities

Plaintiff testified that he suffers from cellulitis in his legs as well as unrelated psoriasis or eczema on the bottom of his foot.  (*Id*. at 114-15).  The more Plaintiff stands or walks, the more likely it is that the bottom of his foot will rub against his shoe, crack open and be exposed to staph which causes infections.  (*Id*. at 115, 117-18).  Plaintiff described the symptoms he suffers from cellulitis as swelling of the legs caused by circulatory problems.  (*Id*. at 115).  The swelling is exacerbated by standing for long periods of time.  (*Id*.).

3.       Plaintiff Requests to Sit As Needed

On or about November 22, 2011, Plaintiff presented Smith with a note from the Center for Family Health signed by a nurse practitioner and which stated "Patient was seen in our office on 11-22-11.  Comments, Please allow to sit as needed."  (Gleed Dep. at 122-123; Ex. 13, Note, 11/22/11).  Plaintiff testified that Smith reviewed the note but said he "wasn't going to honor the paper."  (*Id*. at 124:10).  Smith also allegedly refused to put the note in Plaintiff's employee file.  (*Id*.).  At the time of this discussion, Plaintiff was standing near a pregnant coworker, Alicia Witt (also know as Alicia Grabarek), who was allowed to sit on a chair out on the sales floor due to her pregnancy.  (*Id*. at 144-145).  Plaintiff then asked Smith: "What do I got to do, do I got to get pregnant to sit down? And [Smith] said, Yeah."  (*Id*. at 124:24-125:2).  Plaintiff also testified Smith told him that if he couldn't do the job he should quit.  (*Id*. at 133).  Plaintiff did not speak to anyone else nor contact Defendant's Human Resource Department about sitting as needed during his shifts. (*Id*. at 132-33).

Smith disputes Plaintiff's version of these events.  Smith testified that he did not remember Plaintiff producing a doctor's note regarding a "sit as needed" request but he did

3

remember Plaintiff asking to sit and elevate his leg in relation to an infection.  (Pl.'s Resp., Ex. 2, Smith Dep. at 11).  Smith testified that he instructed Plaintiff that he could use a stool to sit and prop his leg up on the table while on the sales floor or he could take extra breaks to sit in the back room.  (*Id.* at 11).  Smith also testified that Plaintiff did in fact sit on a stool and prop his leg up while on the sales floor.  (*Id.* at 14; *see also* Def.'s Ex. 35, Smith Decl. at ¶¶ 5-6).

Plaintiff testified that despite his request to sit as needed, he could, nevertheless, perform the duties of the retail sales consultant job and there was nothing about the job he was unable to do.  (Gleed Dep. at 113).  Plaintiff explained: "As far as my condition goes, I'm able – I'm able to do that job with accommodation or without the accommodation, and I did do it, but without the accommodation, the pain and suffering was much greater."  (Gleed Dep. at 114:17-21, 136).

It is undisputed that Plaintiff did not request an accommodation to sit as needed as provided by Defendant's specific policies and procedures despite having access to them through Defendant's intranet.  (Ex. 34, Mundis Decl. ¶ 4; Gleed Dep. at 39, 42).  Defendant's polices and procedures provided that employees are required to contact a centralized department, the Integrated Disability Service Center ("IDSC") "which is responsible for determining whether a job accommodation is medically necessitated[,] and coordinating with the employee and the employee's supervisor to determine if an accommodation can be made."  (Mundis Decl. ¶ 4, Ex. A at 11).

4.    Plaintiff's Resignation and Request for an Accommodation for IV Treatment

In June, 2012, Plaintiff had suffered a flare up of his conditions such that he needed to receive IV antibiotic treatment to treat an infection in his feet and legs.  (Gleed Dep. at 66; Ex. 14, Medical notes 6/25/12 indicating "infection in right leg from scratching"; Ex. 15, Emergency

4

Department Chart, 6/27/12, indicating the chief complaint was "cellulitis" and notes that he is administered IV antibiotic treatment).

On June 28, 2012, Plaintiff was referred by his doctor to an infectious disease specialist, Dr. Donna O'Neill, regarding the "cellulitis on his right lower extremity in the setting of psoriasis - which he picks." (Ex. 17, Medical Notes, 6/28/12). Dr. O'Neill's notes indicate that she requested authorization for an IV treatment of the antibiotic, Cubicin. (*Id.*). Her notes indicate specifically "I do not think [the treatment] is going to take very long." (*Id.*).

Smith claimed that Plaintiff requested to be off from work on June 18, and June 20-23, 2012, a request Smith granted despite Plaintiff having no vacation time left. (Ex. 35, Smith Decl. at ¶7). At some point during the time period between June 18 and June 23, 2012 Plaintiff contacted Smith and told him he needed to talk. (*Id.* at ¶8). Plaintiff confirmed that he spoke with Smith before resigning: Plaintiff claims this face-to-face meeting happened on June 29, 2012. (Gleed Dep. at 63). During that meeting, Smith states that Plaintiff explained that while he was working for Defendant, he was also working for another company, was losing money working for Defendant, and therefore was resigning. (Smith Decl. at ¶ 9). Smith then instructed Plaintiff he needed the resignation in writing, which Plaintiff later sent via email. (*Id.*; Ex. 4, Resignation Email, 6/29/12).

Plaintiff's June 29, 2012, resignation email stated:

Erick

Sunday July 1st will be my last day as an employee of AT&T. Beginning Monday July 2nd I am promoting myself to customer. It has been a pleasure being part of your team. You are the best manager I have ever had the pleasure of working for. I appreciate you always leading by example and taking time to teach and coach me. If I'm working for someone else I'm building someone else's dreams. My dreams have always been bigger than my paycheck so I'm officially retiring from

5

the at&t slave camp.

Freedom Awaits ☺

Best of luck to you and your family.

Sincerely
Daniel Gleed

(Ex. 4, Resignation Email, 6/29/12).

Plaintiff explained that his resignation email was sent to notify Defendant he was resigning and that any positive remarks he made about Smith were included only because Plaintiff needed him as a reference. (Gleed Dep. at 52-53, 54-56). Plaintiff also claimed his compliments of Smith were motivated by Plaintiff's fear of Smith because Plaintiff knew Smith to be a "violent individual" and Smith knew where Plaintiff lived. (*Id.*). Plaintiff claimed he had complained about Smith and his behavior to Manzer but did not know if there was ever an investigation of his claims. (*Id*. at 55-56, 61).

Plaintiff alleges that he resigned, not to pursue a different job as stated in his resignation letter, but because Defendant would not adjust his schedule so that he could receive daily IV treatment for his leg infection, a condition which arose on or about June 25, 2012. (*See* Ex. 14, Medical notes 6/25/12; Gleed Dep. at 63, 66-67). Plaintiff visited the emergency room regarding his leg infection on June 27, 2012. (Ex. 15, 6/27/12 medical notes). On June 28, 2012, Plaintiff was told he would need IV treatment daily for four to six weeks to treat his infection.[2] (Gleed

---

[2] Plaintiff never submitted anything to Defendant evidencing that he needed IV treatment for four to six weeks. (Gleed Dep. at 184-85). In fact, there is nothing evidencing that Plaintiff needed any treatment for four to six weeks except for a medical statement dated July 18, 2012 (after the completion of his IV treatments), stating that Plaintiff was "totally disabled" and needed to elevate his feet every two hours for 15 minutes for four to six weeks beginning on June 28, 2012. (Ex. 25, Medical Statement, signed by Dr. Kak, 7/18/12; Gleed Dep. at 185). It is

6

Dep. at 63; Ex. 17, 6/28/12 medical notes).  Plaintiff testified that a week prior to submitting his letter of resignation, Plaintiff requested that Smith rework Plaintiff's work schedule such that he could attend his daily IV treatments but that Smith refused to do so. (Gleed Dep. at 68).  After Smith refused his request, Plaintiff called Defendant's Human Resource department while Smith was also on the line.  (*Id*. at 64, 76-77).  Plaintiff wanted information regarding what his "options were as far as being able to get the [IV] treatment without losing [his] job."  (*Id*. at 66:18-19).

Plaintiff testified that Defendant's Human Resource representative "said I could go a month without pay, come back, fill out the paperwork, and then they would do an investigation. If I was eligible for any pay, then I would receive it."  (Gleed Dep. at 79:7-10).  Despite calling Human Resources to determine what his options were about keeping his job, Plaintiff testified that he never requested a scheduling accommodation from the Human Resource representative. (*Id*. at 80).  After that conversation, Plaintiff went to his specialist, Dr. O'Neill, who told him: "you can either work or you can live."  (*Id*. at 81).

It was at that point, Plaintiff testified that he decided to resign.  (*Id*.).  Plaintiff then had a face-to-face conversation with Smith on the morning of June 29, in which Plaintiff advised Smith he was resigning and offered to give two weeks notice.  (*Id*. at 69, 73).  Smith called Manzer who indicated that Plaintiff did not need to give two weeks notice.  (*Id*. at 63).  Plaintiff then submitted his resignation email that same day.  (*Id*.).  Plaintiff did not have any other

---

undisputed that Plaintiff's IV treatment only lasted seven days.  (Gleed Dep. at 233).  Plaintiff later called his doctor's office to receive a statement that he was not "totally disabled" after July 18, 2012 and testified that he was able to work without restrictions after that date.  (*Id*. at 235; Exs. 30, 31, 32, Medical statements and Phone messages regarding ability to work).

conversations with HR.[3]  (*Id*. at 81, 83, 142).

## II. STANDARD OF REVIEW

Defendant has moved for summary judgment under Rule 56(c) of the Federal Rules of

Civil Procedure.  This rule provides that summary judgment "should be rendered if the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law." Summary judgment is appropriate where the moving party demonstrates that there is no

genuine issue of material fact as to the existence of an essential element of the nonmoving

party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the

initial responsibility of informing the district court of the basis for its motion, and identifying

those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue

of material fact."  *Id*. at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that

fact "would have [the] effect of establishing or refuting one of the essential elements of a cause

of action or defense asserted by the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.

---

[3] The Court notes that Plaintiff was prescribed (and received) IV treatment for his infection by Dr. O'Neill on June 28, 2012, the day before he resigned.  (Ex. 17, 6/28/12 O'Neill medical notes; Ex. 18, 6/28/12, Infusion record).  This time-line casts doubt over Plaintiff's version of events, including his ability to call the Human Resource department the week prior to his resignation regarding a projected four week to six week long absence to receive IV treatments.  Defendant disputes Plaintiff ever called Human Resources.  However, viewing the facts in a light most favorable to Plaintiff, the Court accepts Plaintiff's version of events that he called Defendant's Human Resources regarding his IV treatments prior to submitting his resignation on June 29, 2012.

1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial.  *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment.  *Celotex*, 477 U.S. at 322-23.  The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e).  The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact.  *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

### III. ANALYSIS

#### A.     ADA, Failure to Accommodate

Pursuant to the ADA, an employer may not "discriminate against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a); *Keith v. County of Oakland*, 703 F.3d 918, 923

(6th Cir. 2013). "The ADA defines 'discriminate' to include the failure to provide reasonable accommodation to an otherwise qualified individual with a disability, unless doing so would impose an undue hardship on the employer's business." *Keith*, 703 F.3d at 923 (citing 42 U.S.C. § 12112(b)(5)). To establish a prima facie case of failure to accommodate under the ADA a plaintiff must show that: 1) he is disabled within the meaning of the act, 2) he is otherwise qualified for the position, with or without a reasonable accommodation, 3) his employer knew or had reason to know about his disability, 4) he requested an accommodation, and 5) the employer failed to provide the reasonable accommodation.[4] *Johnson v. Cleveland City School Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011) (citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004)). Further, the "ADA mandates an individualized inquiry in determining whether an [applicant's] disability or other condition disqualifies him from a particular position." *Keith*, 703 F.3d at 924 (citation and quotation marks omitted). "A proper evaluation involves consideration of the applicant's personal characteristics, his actual medical condition, and the effect, if any, the condition may have on his ability to perform the job in question." *Id.*

Plaintiff claims in his Complaint that Defendant violated the ADA when Defendant failed to accommodate his disability by: 1) allowing him to sit when he needed on the sales floor in November 2011, and 2) failing to accommodate his scheduling request so he could receive his daily IV treatments in June 2012. Defendant contends that Plaintiff's claims should be dismissed because he cannot establish that he needed an accommodation to sit on the sales floor and that

---

[4] While Plaintiff spends much of his response establishing that he had qualifying disabilities within the meaning of the ADA, Defendant stipulates in its motion that for the purposes of summary judgment it is not contesting that issue. (Def.'s Br. at 15, n. 4). Therefore, the Court need not determine whether Plaintiff's cellulitis or eczema constitutes a disability under the ADA.

10

Defendant offered Plaintiff an accommodation for his IV treatment but he chose to quit instead.

    1.      Sitting Accommodation

    Defendant argues that Plaintiff's accommodation claim, as based on his request for a sitting accommodation in November 2011, must fail because Plaintiff cannot establish that he actually needed such an accommodation.  Plaintiff testified twice in his deposition that he could perform the job with or without sitting as needed and that he actually did perform the job without that accommodation for some seven or eight months before quitting his position with Defendant. (*See* Gleed Dep. at 113-14, 136).

    The U.S. Court of Appeals for the Sixth Circuit has made clear that "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.  *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases).  The Court notes that Plaintiff failed to respond to Defendant's arguments regarding his ADA accommodation claim based on his request to sit as needed in November 2011 in his response to the summary judgment motion.  However, during oral argument Plaintiff argued that Defendant failed to engage in the interactive process after Plaintiff requested to sit as needed in November 2011.  To the extent Plaintiff has abandoned this claim, summary judgment is appropriate.  To the extent Plaintiff's claim is not abandoned, the claim fails on its merits because Plaintiff testified he did not need an accommodation to do his job.  Additionally, Plaintiff failed to properly request such an accommodation, and the fact he continued to work without complaint and without any further request for an accommodation from Smith or Defendant's Human Resource department for seven months, confirms his testimony that he did not actually need a sitting accommodation.

    In *Landefeld v. Marion General Hospital, Inc.*, in the context of an analogous claim

11

under the Rehabilitation Act, the Sixth Circuit held that a plaintiff's reasonable accommodation claim failed where it was "prove[n] [plaintiff] was able to perform the duties of the job, in spite of handicap, because since his suspension, plaintiff ha[d] been serving in the same capacity at another hospital without special accommodations. Hence, there [was] no need for defendant to make any accommodations for plaintiff's handicap." 994 F.2d 1178, 1182 (6th Cir. 1993). The same reasoning applies here. *See Holiday v. City of Chattanooga*, 206 F.3d 637, 642 n. 1 (6th Cir. 2000) (claims that are brought pursuant to the Rehabilitation Act are reviewed under the same standards that apply to a claim brought pursuant to the ADA). In the current action, Plaintiff expressly testified that he could perform his job without his requested accommodation and that he did perform his job without an accommodation for seven months. *See Gooden v. Consumers Energy Co.*, No. 12-11954, 2013 WL 4805061, * 6 (E.D. Mich. Sept. 9, 2013) (holding that a plaintiff failed to show that "being assigned to work near his home for testing and insulin administration at home is a reasonable accommodation necessary to perform the essential functions of his job" when he testified that he could perform his job even when assigned to work areas not close to his home.); *see also Gaines v. Runyon*, 107 F.3d 1171, 1178 (6th Cir. 1997) (holding that in the context of a Rehabilitation Claim, "[t]he plaintiff must ... demonstrate that without the requested accommodation, he is unable to perform the essential functions of his job.").

Further, the Court notes that Plaintiff failed to properly request an accommodation to sit as needed, as provided by Defendant's policies and procedures despite having access to them through Defendant's intranet. (Ex. 34, Mundis Decl. ¶ 4; Gleed Dep. at 39, 42). In fact, Plaintiff never asked anyone else about receiving a sitting accommodation for seven months until his resignation. Moreover, as of June 28, 2012, Plaintiff needed to be off his feet every fifteen

minutes every two hours, an accommodation that was satisfied by his standard fifteen-minute break every two hours and a thirty-minute lunch break.  (Pl.'s Dep. at 239; Ex. 32, 11/9/12 Medical Note).

For these reasons, the Court finds that to the extent Plaintiff's ADA claim based on his request for a sitting accommodation is not abandoned, the claim still fails where the record clearly reflects and supports Plaintiff's ability to perform the essential functions of the job and Plaintiff's failure to properly request an accommodation as provided by Defendant's policies.

2.     Scheduling Accommodation for IV Treatments

Plaintiff also alleges that Defendant violated the ADA when it failed to allow Plaintiff to receive IV injection treatments during working hours.  (Pl.'s Resp. at 7).  Plaintiff argues that Defendant had a duty to engage in an "interactive process" and instead, Plaintiff's request for an accommodation to his schedule was "simply denied".  (Pl.'s Resp. at 12).

Plaintiff explained that after seeing an infectious disease specialist, Dr. O'Neill, he asked Smith for a schedule accommodation so he could receive his IV treatments.  (Gleed Dep. at 75-76, 77).  Smith rejected Plaintiff's request to adjust his schedule and as a result of that rejection, Plaintiff called Defendant's Human Resource department and conference-called Smith in on the conversation.  (*Id*. at 75-77).  Plaintiff called the Human Resource department to find out what his "other options were" but testified that he never asked the Human Resource Representative for "an accommodation of the schedule to change the schedule."  (*Id*. at 74:23, 79:25-80:3). Therefore, it appears that Plaintiff only requested that he be allowed "to receive the IV injections during work hours."  (*See* Pl.'s Resp. at 7, his description of his claim).

Plaintiff apparently explained his need for IV treatments during the phone call with Human Resources.  Defendant's representative then told him that he could take an unpaid leave

13

of absence and "fill out the paperwork, and then they would do an investigation. If [he] was eligible for any pay, then [he] would receive it."  (Gleed Dep. at 79:7-10).  This is consistent with Defendant's representation that employees who are approved for FMLA leave of absence "are eligible to apply for and potentially receive wage-replacement short-term disability benefits if the employee's leave of absence lasts longer than seven days."  (Ex. 34, Mundis Decl. at ¶ 6). Plaintiff could not remember if the Human Resource representative referred to this leave time as "FMLA leave" or "Family Medical Leave Act leave" however, Plaintiff referred to this suggested leave of absence as pursuant to "FMLA" in an email to the EEOC dated October 15, 2012.  (*Id*. at 78, 191-93; Ex. 24, email to EEOC dated 10/15/12).  Plaintiff rejected Defendant's offer of leave because he did not want to take time off without pay, instead deciding to quit his job.  "Q. So instead, you quit your job and have been without pay since that time?  A. Yeah.". (*Id*. at 189:5-7).

Plaintiff argues that his claim parallels the issues set forth in *Colwell v Rite Aid Corp*., 602 F.3d 495 (3d Cir. 2010).  In *Colwell*, the plaintiff was a cashier who was blind in one eye and requested that she be allowed to work the day shift because it was difficult and created a hardship for her to drive at night.  *Id*. at 499.  The issue before the Third Circuit was whether the defendant had a duty to accommodate her shift change request when she had no issues with performing her job duties while at work, and her request for an accommodation related only to commuting.  *Id*. at 504.  The Third Circuit held that "under certain circumstances the ADA can obligate an employer to accommodate an employee's disability-related difficulties in getting to work, if reasonable."  *Id*. at 505.

The Court finds that Plaintiff misapprehends the issue presented in the *Colwell* decision, which was not whether a schedule or shift change is considered a reasonable accommodation but

rather the discreet issue of whether an employee's disability related issue regarding her commute fell within the realm of an ADA reasonable accommodation. In the instant case, there is no argument that Plaintiff's alleged request to receive IV treatments during work hours or for a schedule change would be within the realm of a reasonable ADA accommodation, as such an accommodation is provided in the statute itself. *See* 42 U.S.C. § 12111(9) (defining "reasonable accommodation" as "job restructuring, part-time or *modified work schedules*, reassignment ..." (emphasis added)). Rather, the pertinent issue before this Court is whether Defendant's offer of medical leave and short term disability constitutes a reasonable accommodation which Plaintiff summarily rejected. The Sixth Circuit has explained:

> The disabled employee bears the burden of proposing an accommodation and showing that it is objectively reasonable. Where there is more than one reasonable accommodation, the choice of accommodation is the employer's. The employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide. An employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided. An employee who declines an offered reasonable accommodation forfeits the status as a qualified individual with a disability.

*Smith v. Honda of Amer. Mfg., Inc*., 101 F. App'x 20, 25 (6th Cir. 2004) (per curiam) (internal quotation marks and citations omitted); *see also Obnamia v. Shinseki*, No. 12-58, 2013 WL 5408267, *3 (S.D. Ohio, Sept. 25, 2013) (finding same, collecting authority).

Here, Plaintiff's *own* testimony establishes he never specifically requested a scheduling accommodation from Defendant's Human Resources representative but that when he inquired about his "options" he was offered medical leave with the possibility of wage replacement if he qualified. Plaintiff rejected that accommodation despite never inquiring how long the "investigation" would take or how the medical leave process worked. (Gleed Dep. at 188).

15

Moreover, Plaintiff fails to offer any argument or case law to evidence that Defendant's offered accommodation of FMLA leave and short term disability was not a reasonable accommodation. The Sixth Circuit has held that "a medical leave of absence can constitute a reasonable accommodation under appropriate circumstances." *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 783 (6th Cir. 1998) (finding that a plaintiff's request for unpaid medical leave could be a reasonable accommodation if the employer could not show it was unduly burdensome.). While Plaintiff may have preferred to have a different schedule rather than take a medical leave of absence, Plaintiff "cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided." *Smith*, 101 F. App'x, at 25.

Therefore, the Court finds there in no genuine issue of material fact regarding whether Defendant engaged in the "interactive process" and rejects Plaintiff's argument that Defendant "simply denied his requests for accommodation." (Pl.'s Resp. at 12). Plaintiff was offered a reasonable accommodation which he chose to reject and thereafter ended the interactive process in favor of resigning to further pursue his other employment at that time. Summary judgment on this claim is warranted.

**B.     Reverse Discrimination Claim**

Pursuant to Title VII's anti-discrimination provision, "it is 'an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008) (quoting 42 U.S.C. § 2000e-2(a)(1)).

Pursuant to Title VII, a plaintiff may show reverse discrimination either by showing

16

direct evidence of discrimination or circumstantial evidence that would support an inference of discrimination.  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).  "Direct evidence is 'that evidenced which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'"  *Lautermilch v. Findlay City Schools*, 314 F.3d 271, 276-77 (6th Cir. 2003) (citing *Laderach v. U-Haul of Northwestern Ohio*, 207 F.3d 825, 829 (6th Cir. 2000); *Thompson v. City of Lansing*, 410 F. App'x 922, 929 (6th Cir. 2011) (same).  Circumstantial evidence is evidence that does not establish discriminatory animus on its face but does allow a fact-finder to draw the reasonable inference that discrimination occurred.  *Ondricko v. MGM Grand Detroit, LLC*, 689 F.2d 642, 649 (6th Cir. 2012) (citation omitted).

"If a plaintiff cannot present evidence of discrimination, he may prove his claim through circumstantial evidence, applying the familiar burden-shifting analysis set forth in *McDonnell Douglas*."  *Thompson*, 410 F. App'x at 932 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  A plaintiff can establish a prima facie case of discrimination under *McDonnell Douglas* by establishing: "(1) she is a member of a protected group; (2) she was subject to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected class or similarly situated non-protected employees were treated more favorable."  *Grace v. USCAR*, 521 F.3d 655, 677 (6th Cir. 2008).  In a reverse discrimination case such as this, where a member of the majority group claims discrimination, the Sixth Circuit has modified the first and fourth prongs of the traditional discrimination prima facie test.  *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004).  "In such cases, the plaintiff must establish the first prong by showing that there are background circumstances indicating that the defendant employer is the unusual employer who discriminates against the majority."

17

*Thompson*, 410 F. App'x at 932 (internal quotation marks omitted) (citing *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003)).  "To satisfy the fourth prong in a reverse-discrimination case, the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class."  *Leadbetter*, 385 F.3d at 690 (citation omitted).

After a plaintiff has carried his burden in establishing a prima facie case of discrimination, "then the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's discharge."  *Grace*, 521 F.3d at 677 (citing *McDonnell Douglas*, 411 U.S. at 802).  If the defendant can demonstrate a legitimate reason for the discharge then the burden reverts to the plaintiff to set forth that defendant's proffered reason is mere pretext for discrimination.  *Grace*, 521 F.3d at 677 (citing *Tex. Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  However, the "burden of persuasion" remains on the plaintiff at all times.  *Grace*, 521 F.3d at 677 (citation omitted).

1.      Direct Evidence

Plaintiff claims that his verbal exchange with Smith, in which Plaintiff asked, "What do I got to do, do I got to get pregnant to sit down? And [Smith] said, Yeah.", constitutes direct evidence of reverse gender discrimination.  (Gleed Dep. at 124:24-125:2).

First, the Court finds that Plaintiff's comment may not constitute direct evidence of gender discrimination because his comment was directed at his coworker's status of being pregnant not at her gender.  Indeed, Plaintiff's question to Smith was not whether he could get a sitting accommodation if he were a woman, but rather if he was pregnant.  Nevertheless, even assuming that Plaintiff's exchange with Smith constitutes direct evidence of reverse gender discrimination, Plaintiff's claim fails from the outset because he cannot show that he suffered

18

from an "adverse employment action."  *Policastro v. Northwest Airlines, Inc.,* 297 F.3d 535, 539

n.1 (6th Cir. 2002), (holding that "whether [the plaintiff] proceeds on the basis of direct evidence

or circumstantial evidence, <u>she must demonstrate an adverse employment action</u>".) (emphasis

added) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000)); *see also*

*Antonucci v. Goodyear Tire & Rubber Co.*, 16 F.3d 1218, 1994 WL 49569, *2 (6th Cir. 1994)

(Table Decision) (finding same in context of ADEA claim).

        In this action, Plaintiff cannot show that he has suffered an "adverse employment action"

as defined by the Sixth Circuit because Plaintiff testified in his deposition (twice) that he did not

require the accommodation to sit to perform his job.  "In the context of a Title VII discrimination

claim, an adverse employment action is defined as a 'materially adverse change in the terms and

conditions' of employment."[5]  *Laster*, 746 F.3d at 727.  The Supreme Court has explained that an

_____

        [5] It is noted that "a plaintiff may succeed on a Title VII discrimination claim without
showing the existence of an adverse employment action by showing that he 'was subjected to
severe or pervasive ... [discriminatory] harassment by a supervisor.'"  *Laster*, 746 F3d at 727, n. 2
(quoting *Morris v. Oldham Ctny Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000)).  However,
Plaintiff has failed to allege that there was such "severe or pervasive" harassment and the facts of
this case do not support a conclusion that this type of harassment existed at Defendant's Jackson
store.  Indeed, Plaintiff does not cite any other discriminatory remarks from any other of
Defendant's employees nor does he reference any other time that he requested a sitting
accommodation that was denied.  Further, Plaintiff's assertion that the adverse employment
action he suffered was harm to his mental health or psychological well-being is off the mark.
Plaintiff did not testify as to any mental harm or anguish that he suffered as a result of Smith's
remark or the denial of his single request for a sitting accommodation.  In fact, the record is clear
Plaintiff never complained at any other time or to any one else regarding the denial of his sitting
request in November 2011, clearly contradicting Plaintiff's claim that "Defendant's action had
the effect of unreasonably interfering with Mr. Gleed's work performance and created an
intimidating, hostile and offensive work environment."  (Pl.'s Resp. at 20).  Moreover, the case
law Plaintiff relies upon to bolster his claim that his "severe emotional distress" constitutes an
adverse employment action are all cases in which an employee was complaining of a hostile
work environment.  Here, Plaintiff fails to allege a similar situation nor is there any evidence that
Plaintiff suffered any "mental anguish" after being denied a sitting accommodation where he
never requested such an accommodation again, he worked without complaint for seven more
months, and there is no evidence or testimony that he suffered or received treatment for the

adverse employment action "constitutes a significant change in employment status, such as

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S.

742, 761 (1998). "Adverse employment action 'requires an official act of the enterprise, a

company act. The decision in most cases is documented in official company records, and may be

subject to review by higher level supervisors." *Laster*, 746 F.3d at 727 (citation omitted). Such

an action typically "inflicts direct economic harm" upon the employee. *Id*. "Employment

actions that are *de minimis* are not materially adverse and are not actionable under Title VII."

*Wills v. Pennyrile Rural Elec. Co-op. Corp*., 259 F. App'x 780, 783 (6th Cir. 2008) (citing

*Bowman v. Shawnee State Univ*., 220 F.3d 456, 462 (6th Cir. 2000)).

In the present action, Plaintiff claims that he suffered reverse discrimination when he was

denied the ability to sit, when needed, on the sales floor. However, Plaintiff testified in his

deposition *twice* that he did not need such an accommodation and he could perform his job with

out the accommodation. Plaintiff also testified that he did in fact do the job without an

accommodation from November 2011 until he quit some seven months later in June 2012. In

light of these facts, the alleged denial of such an accommodation cannot rise to the level of a

"materially adverse employment action." Indeed, there is nothing in the record that evidences

that Plaintiff was denied a promotion, demoted, reassigned with different responsibilities, or any

allegation that could be construed as inflicting economic harm on Plaintiff or affecting his

employment status. Therefore, to the extent Plaintiff's reverse discrimination claim is based

upon Smith denying Plaintiff's single request to sit as needed seven months prior to his

---

same.

20

resignation, the claim fails because it is a *de minimis* employment action at best and not actionable.

As the Court finds Plaintiff cannot establish discrimination through direct evidence because he fails to set forth a materially adverse employment action, any claim that Plaintiff could make regarding a circumstantial case for discrimination would fail for the same reason.

To the extent that Plaintiff's reverse discrimination claim can be construed as alleging that the adverse employment action that Plaintiff suffered was a "constructive discharge", that claim is examined and rejected below.

## C.      Constructive Discharge Claim

Finally, Plaintiff has alleged a claim of "construction discharge" in his complaint.  To this end, Plaintiff argues that he was constructively discharged as a result of the disability discrimination and gender harassment that he suffered: stating "it is obvious that the Defendants had contempt and disdain for disabled workers, and no desire to accommodate Mr. Gleed for his disability.  The treatment received by Mr. Gleed as delineated above was simply an effort to force his resignation."  (Pl.'s Resp. at 15).  Defendant contends Plaintiff's constructive discharge claim fails because no reasonable person would feel compelled to quit under the described circumstances alleged and the sole case Plaintiff relies upon is unavailing.

The Sixth Circuit recently explained, "[a] constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation."  *Laster*, 746 F.3d at 727 (internal quotation marks and citation omitted).  To evidence a constructive discharge, Plaintiff must show: "1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to

21

quit." *Id.* (citing *Saroli v. Automation and Modular Components, Inc.*, 405 F.3d 446 (6th Cir. 2005) and *Logan v. Denny's, Inc.*, 259 F.3d 558, 566, 568 (6th Cir. 2001)).  In *Logan*, the Sixth Circuit adopted the Fifth's Circuit's analysis of constructive discharge claims, holding that a court should consider certain factors to determine whether the first prong of the constructive discharge inquiry has been satisfied:

> Whether a reasonable person would have [felt] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly, or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

259 F.3d at 569 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).  The Sixth Circuit has also noted that when a court is "faced with a situation in which the employee only alleges that she resigned because of discriminatory harassment ... we require the plaintiff to demonstrate a discriminatory work environment even more egregious than the high standard for hostile work environment."  *Laster*, 746 F.3d at 728 (quoting *EEOC v. University of Chicago Hosp.*, 276 F.3d 326, 331-32 (7th Cir. 2002)).

Plaintiff argues that the *Talley v. Family Dollar Stores of Ohio, Inc.* decision is analogous to the present case.  542 F.3d 1099 (6th Cir. 2008).  In *Talley*, the Sixth Circuit held that there was enough evidence produced such that a reasonable jury could conclude the defendants intended the plaintiff to resign and it was foreseeable that she would, when the defendants: "(1) denied her the use of the stool after years of being able to use it, (2) refused to read a doctor's note that she delivered upon their request, (3) failed to organize a meeting to discuss the issue, and (4) failed to contact her regarding the status of the meeting or with other alternatives to

22

resolve the issue." *Id*. at 1109.  Plaintiff's reliance on this decision, however, is misplaced because the Sixth Circuit explicitly cautioned in *Talley*:

> We emphasize that our holding today does not pave the way for an employee to assert a claim for constructive discharge every time an employer fails to accommodate her disability.  But when an employee makes a repeated request for an accommodation and that request is both denied and no other reasonable alternative is offered, a jury may conclude that the employee's resignation was both intended and foreseeable.

*Id*. at 1109 (emphasis added).

In the present action, Plaintiff requested that he be allowed to sit as needed one time in November, 2011.  Plaintiff claims this request was denied by Smith and admits that he never requested such an accommodation again.  Plaintiff also testified that he did not need such an accommodation to perform his job, and it is undisputed that he did perform his job, without complaint, for seven months after the sit as needed accommodation was rejected.  Further, Plaintiff testified that Defendant offered him medical leave so he could receive his IV treatments, but Plaintiff rejected that offer.  Also, the Court notes that Plaintiff testified that he actually never asked Defendant's Human Resource representative for a schedule change.  Rather he testified he was merely looking into his options.  These facts are inapposite to the facts in *Talley*, where the plaintiff repeatedly requested an accommodation to sit on a stool, and the plaintiff alleged the defendant did not engage in the interactive process in good faith because it failed to respond to her multiple calls and never set up a promised meeting regarding her request to use a stool to sit.  *Id*. at 1110.  Therefore, in this action, where Plaintiff did not make a repeated request for an accommodation and where Defendant offered Plaintiff medical leave, there is simply no comparison to *Talley* and no argument that a reasonable person would have felt compelled to quit.

23

Moreover, Plaintiff offers no argument or evidence that Defendant's actions were intended to induce or force Plaintiff to quit. *See Laster*, 746 F.3d at 728 (finding a plaintiff's constructive discharge claim lacking when "he has not presented any evidence that this behavior was undertaken with the specific intention of forcing Plaintiff to quit...Simply put, Plaintiff has not adduced sufficient evidence to show that Defendants *deliberately* created intolerable working conditions with the *intention* of forcing Plaintiff to quit." (emphasis in original)). Rather, the whole of Plaintiff's argument is contained in the conclusory statement that "the refusal to acknowledge Mr. Gleed's note from his physician, the refusal to allow him to rest his feet during the work day, and the refusal to accommodate him for his IV treatments all were orchestrated in an effort to get Mr. Gleed to resign from his employment." (Pl.'s Resp. at 15-16). This statement fails to cite any evidence that could support a finding that the Defendant "intended" Plaintiff to quit, especially in light of Defendant's offer of an accommodation and Plaintiff's intervening seven months of continued employment without complaint.

In light of these facts, the Court finds that Plaintiff cannot establish that there are any genuine issues of material fact regarding whether Defendant deliberately created intolerable working conditions or whether Defendant intended Plaintiff to quit. Therefore, Plaintiff's claim of constructive discharge fails.

## IV. CONCLUSION

For all these reasons, the Court GRANTS Defendant's motion for summary judgment (Dkt. No. 20) and DISMISSES Plaintiff's Complaint with PREJUDICE.

SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
Dated:  July 28, 2014          UNITED STATES DISTRICT JUDGE

24

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 28, 2014.

s/Deborah Tofil
Case Manager